STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:  (415) 436-7706
Email:  Angela_Chuang@fd.org

Counsel for Defendant Mayon

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 19–617 MMC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | **Court:** Courtroom 7, 19th Floor |
| MERLIN MAYON, | **Hearing Date:** May 6, 2020 |
| Defendant. | **Hearing Time:** 2:15 p.m. |

# INTRODUCTION

Until the age of 12, Merlin Mayon's idea of "home" consisted of a school bus with no access to basic utilities where he lived with his parents and four older half-siblings. Seven people lived in what small space the bus interior afforded them, scraping by with no running water, no plumbing, no toilet, and oftentimes no food. Deprivation was the norm during Mr. Mayon's formative years. As was rampant drug use by both his parents—his supposed role models—and exploitation of Mr. Mayon and the other children who were forced to panhandle to support that habit. His parents also kept him out of the school system until he was 14 years old, which further alienated him from mainstream society and the potential positive influences that increased socialization with people and peers outside his family unit could have provided him. As if the repeated trauma of growing up under these conditions of abuse and neglect was not enough for Mr. Mayon to deal with as a child, he also suffered a devastating loss at the age of 13 when he lost his best friend to a shooting that he personally witnessed.

Mr. Mayon is now 24 years old—still a young man but one who has seen and experienced more difficulties and traumas than most people do in an entire lifetime. His immensely difficult childhood has had subsequent rippling impacts throughout his life up to present day. He has struggled, as any person would, with the psychological and emotional damage wrought upon him by his upbringing, and unsurprisingly has been diagnosed with Post-Traumatic Stress Disorder ("PTSD"). He has also fallen victim to his own issues with substance abuse, an unfortunate development that he is fighting to overcome and one that can be directly linked to his extensive childhood exposure to such behavior in his parents. It is against this backdrop that he now comes before the Court for a single sale of 8 Xanax pills.

Despite all of the disadvantages that have imbued the two-and-a-half decades of his life, Mr. Mayon is determined to do what he needs to do to get back on track. He does not want to repeat the same mistakes that his parents made and he instead wants to continue being a responsible father to his 4-year-old son, Josiah. He is in a stable, loving relationship with his girlfriend, and Mr. Mayon has even come to view her mother as his own surrogate parent—arguably, the first positive parental figure that Mr. Mayon has ever had. Mr. Mayon takes responsibility for his actions and understands

that he must face consequences for what he has done, but also asks the Court to take into consideration his exceedingly challenging background and the lasting effects it doubtless has had on his judgment and behavior. He respectfully requests that the Court impose a sentence of time served[1] followed by one year of supervised release. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

## ARGUMENT

### I. A Sentence Of Time Served Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)

In sentencing Mr. Mayon, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Mr. Mayon agrees with the Guidelines calculation in the Pre-Sentence Report ("PSR") with a final offense level of 4 and a Criminal History Category of III. The resulting advisory Guidelines range is 0–6 months. This range falls within Zone A of the Sentencing Table, meaning that the

---

[1] Page 1 of the PSR states that Mr. Mayon was arrested on November 20, 2019, and released that same day. PSR at 1. He was actually arrested on November 29, 2019, and spent a night in custody before he was released on bond the following day.

DEF'S SENT. MEM.
*MAYON*, CR 19–617 MMC

2

Guidelines do not require a sentence of imprisonment. U.S.S.G. § 5C1.1(b).

**A.     The nature and circumstances of the offense**

Mr. Mayon was arrested as part of the government's Federal Initiative for the Tenderloin ("FITT") targeting cases arising in the Tenderloin for federal prosecutions, many of which involve relatively minor drug offenses that normally would be prosecuted only at the state level. Along those lines, Mr. Mayon's conduct in the instant matter consisted of selling $40 worth of Xanax—eight pills—to an undercover San Francisco Police Department ("SFPD") officer. PSR ¶ 10. When he was arrested, five more pills were found on his person, bringing the sum total of controlled substances in this case to 13 pills. *Id.* ¶ 12. This offense was a quintessential street-level drug sale that did not involve violence, weapons, threats, large quantities of drugs, or other aggravating factors.

Additional time in custody is not warranted and would be overly punitive in the instant matter. To place Mr. Mayon's conduct in perspective, the base offense level of 6 is the lowest possible base offense level in the Guidelines' drug quantity tables. *See* U.S.S.G. §§ 2D1.1(c)(1)–(c)(17). **The Guidelines calculation would be the exact same if Mr. Mayon had sold or possessed 15,999 Xanax pills as opposed to the mere 13 pills that the relevant conduct in this case involves**. *See* U.S.S.G. §§ 2D1.1(a)(5), (c)(17); PSR ¶ 17. This means that he could have possessed over 1230 times the amount of Xanax than he did, and he would still face the same range of 0–6 months. When viewed in this light and in relation to the substantially more serious drug cases that normally arise in federal court, Mr. Mayon's offense clearly falls at the relatively minor end of the spectrum. A sentence of time served—the low end of the Guidelines range—would appropriately recognize the vast universe between 13 pills and 15,999 pills.

Mr. Mayon filed no motions in the case, and pleaded guilty at his second appearance in District Court. The Court should take into consideration such timely acceptance of responsibility.

**B.     The history and characteristics of Mr. Mayon**

<u>1. Mr. Mayon's pretrial supervision and home detention</u>

At Mr. Mayon's initial appearance on November 20, 2019, he was released on an unsecured bond subject to pretrial supervision, the conditions of which included electronic location monitoring and outpatient drug treatment. *See* PSR ¶¶ 4–5. Shortly thereafter, he found a part-time position with

UPS, where he excelled at his job, as attested to by his superiors in a letter written in February. *See* Declaration of Angela Chuang in Support of Defendant's Sentencing Memorandum ("Chuang Decl."), Ex. A. The drug testing conditions of his pretrial supervision admittedly have not gone as well, which indicates that he could benefit greatly from continued treatment and access to services that federal supervised release would be able to provide to him. Mr. Mayon successfully achieved sobriety for a period of time until increased anxiety about the case triggered a relapse shortly before his change of plea hearing. *See* PSR ¶¶ 2, 5 (indicating that Mr. Mayon tested positive for drugs on January 15, a week before his change of plea on January 22). At a bail review hearing on February 19, 2020, his conditions of release were modified to include increased drug counseling as well as home detention on top of the pre-existing ankle monitor condition that had been imposed at the inception of the case. *Id.* ¶ 4–5. The subsequent positive drug tests from the next two weeks that are referenced in the PSR, ¶ 6, do not necessarily indicate continued usage, but rather could have come from residual amounts in Mr. Mayon's body stemming from past usage prior to the February 19 hearing; it is well-established that marijuana can be detected in urine for up to 30 days from the time of last usage[2] and methamphetamine for up to 3 days.[3] It should also be noted that Mr. Mayon's mother passed away mere days before the bail review hearing, a loss that would act as a significant stressor for anyone, let alone someone like Mr. Mayon who was already struggling with a drug problem.[4] PSR ¶ 39. What this record indicates is that Mr. Mayon's substance abuse may have been more serious than initially thought, and that he requires support to help him develop more productive coping mechanisms.

      Significantly, Pretrial Services has not filed any violation notices regarding Mr. Mayon's home detention condition, indicating that he has complied with this severe restriction on his liberty. This form of intense supervision is more akin to home confinement than to release, as Mr. Mayon cannot

---

[2] *See* Mayo Clinic Laboratories, *Marijuana – Tetrahydrocannabinol (THC)*, available at https://www.mayocliniclabs.com/test-info/drug-book/marijuana.html.
[3] *See* Mayo Clinic Laboratories, *Amphetamine-Type Stimulants (ATS)*, available at https://www.mayocliniclabs.com/test-info/drug-book/amphetamine.html.
[4] Even though Mr. Mayon recognizes that his mother had substantial failings as a parent, she was still his mother and her death affected him deeply.

leave except for legal, medical, or employment purposes.[5] By the time of sentencing on this matter, he will have spent just under three months in home detention and a total of over six months on an ankle monitor. He would not receive any credit from the Bureau of Prisons for this time spent in home detention. This Court should take into consideration the six months that Mr. Mayon has been subject to intense supervision via electronic location monitoring, and in particular, the roughly three months that he has been in home detention, by imposing a custodial term of time served. *See* U.S.S.G. § 5C1.1(e) (stating that one day of home detention can substitute for one day of imprisonment).

### 2. Mr. Mayon's personal background

Mr. Mayon's childhood and the environment in which he grew up was as far from average and stable as imaginable. He spent his first 12 years living—or rather, "surviving" may be the more accurate term—with both his parents and his older half-siblings in a school bus parked near Ocean Beach. *See* PSR ¶ 41. As many as seven family members at a time shared this limited space, which was never converted to adequately meet any of their basic needs. While the idea of living in a school bus may conjure up idyllic images of a quaint alternative lifestyle, the reality of doing so was markedly different for Mr. Mayon. The bus was not hooked up to any utilities or running water, meaning that the family did not have easy access to a toilet or shower. *Id.* This lack of water access meant that Mr. Mayon and his siblings were responsible for filling up jugs with water from public bathrooms whenever possible. *Id.* Most troubling, it also forced Mr. Mayon and his family to regularly defecate and urinate in plastic bags, a situation that would be extremely concerning for any adult, let alone for young children. *See id.* Mr. Mayon would go days or weeks without showering, and it was impossible to practice proper hygiene in his living situation.

As if that were not difficult enough, Mr. Mayon also learned to live without knowing when his next meal would be. The family survived on welfare and panhandling, and it was common throughout his childhood for all of them to go hungry. *See id.* Not only was food and money scarce, but they were even scarcer due to his parents' problematic behaviors and priorities. Both his parents were avid

---

[5] If the shelter-in-place orders related to the COVID-19 pandemic have taught the general public anything, it is that home confinement is extremely restrictive and difficult.

drug users who spent money on illicit substances instead of on their children. *Id.* ¶ 42. Mr. Mayon's father regularly used heroin even while suffering from terminal lung illness that sidelined him from participating in his son's daily life, and Mr. Mayon's mother regularly used crack well into his teenage years. *Id.* His mother exploited her own children by using them to panhandle for money, then she spent that money to buy drugs for herself instead of food or clothing for her kids. *Id.* On top of this neglect and emotional abuse, Mr. Mayon was also a victim of his mother's physical abuse, as she would hit the children with belts or other objects. *Id.*

Sadly, even school was not available as a way for him to escape the daily misery of his upbringing, because his mother kept him out of the traditional school system for much of his childhood. *See id.* ¶ 57. Instead, she claimed that she was homeschooling Mr. Mayon, though in reality, she completed the assignments herself and did not bother actually teaching Mr. Mayon the curriculum. *Id.* It was only after he became involved with the juvenile justice system at the age of 14 that he began to attend public school pursuant to court mandate. *Id.* ¶¶ 56–57. By then, he required an Individualized Education Plan based on his dyslexia and the fact that he was so behind in his studies due to his prior "homeschooling." *Id.* ¶ 57. Mr. Mayon's first contact with the juvenile justice system occurred shortly after he had witnessed his best friend being shot and killed at the tender age of 13, and the timing of these two events is likely more than mere coincidence. *Id.* ¶¶ 27, 45. His friend's death still haunts him to this day and given the nature of Mr. Mayon's family life, he could not find solace from his people who should have given him the most support.

"Lack of parental guidance" seems insufficient to describe the extent of what Mr. Mayon experienced in his formative years, and it is no surprise that he continues to suffer from Post-Traumatic Stress Disorder. *Id.* ¶ 51. Though CPS became involved with his family as early as his infancy, the agency was unable to appreciably improve the children's living circumstances. *Id.* ¶ 41. His early and lengthy exposure to two parents with serious drug addictions placed him at greater risk of developing his own addiction, which sadly came to fruition. *See* Rachel N. Lipari & Struther L. Van Horn, *The CBHSQ Report: Children Living With Parents Who Have a Substance Use Disorder*, SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADM. (August 24, 2017) ("These children [of parents with a substance use disorder or SUD] are also more likely to have higher rates

of mental and behavioral disorders. Children who are exposed to a parent with SUDs are more likely to develop SUD symptoms themselves.") (citing Joseph Biederman et al., *Patterns of Alcohol and Drug Use in Adolescents can be Predicted by Parental Substance Use Disorders*, 106 PEDIATRICS 4 (2000)).[6] Mr. Mayon has struggled with drug use that he turned to as a coping mechanism to help him numb the effects of his past; he is open to continuing treatment to address this underlying issue. Placing him immediately on supervised release would allow him access to the U.S. Probation Office's resources and services to help him achieve and maintain sobriety without interrupting the treatment regimen currently in place.

In short, the Court should consider the extreme disadvantages of his upbringing and his parents' utter failure to meet his basic needs and prepare him to be a productive member of society, as well as the role that his background inevitably played in his conduct in this case. Despite these travails, Mr. Mayon has tried and continues to try to overcome his challenging childhood and make a life for himself, his girlfriend, and his 4-year-old son, Josiah. He has worked at various lawful jobs since 2012, when he was still a teenager. *See id.* ¶ 60. Most recently, while on pretrial release, he worked part-time at UPS for several months until he unfortunately was laid off. *Id.* ¶ 59. Prior to his lay off, he had performed so well that he was in training for a supervisory position. *Id.* UPS has since contacted Mr. Mayon to re-hire him, and he plans to go back to work there once he is fully recovered from a recent bout with COVID-19. *Id.* ¶¶ 50, 59. Mr. Mayon also hopes to continue his education and pursue a GED, which would allow him to become an apprentice electrician at his girlfriend's father's business. *Id.* ¶ 58.

Most importantly, Mr. Mayon has finally found himself a stable and supportive environment that he never experienced with his own family. He and his girlfriend have been in a relationship for three years and enjoy a nurturing, positive partnership. *Id.* ¶ 48. Her mother, who lives with them, has become a surrogate parent in Mr. Mayon's life. He co-parents Josiah with his ex-girlfriend, with whom he remains on good terms; he strives to be the best parent that he can be, so that his son does not experience the deprivation and difficulties that he himself experienced. This instant conviction is

---

[6] Available at https://www.samhsa.gov/data/sites/default/files/report_3223/ShortReport-3223.html.

DEF'S SENT. MEM.
*MAYON*, CR 19–617 MMC

7

Mr. Mayon's first felony conviction[7] and his first time in federal court, which has driven home to him that he must get his life back on track or risk missing out on valuable time that he could have spent with Josiah. He is no stranger to adversity and he knows that the path forward will not be easy, but is determined to improve himself and avoid any further contact with the criminal justice system.

### C. The need to avoid unwarranted sentencing disparities

A time-served sentence would avoid unwarranted disparities with defendants in similar cases arising from the FITT that involve a greater quantity of controlled substances than was present in Mr. Mayon's case. The cases cited below also involve substances that are categorized at a higher Schedule (I or II) under the Controlled Substances Act than Xanax (Schedule IV). This becomes especially apparent when one looks at the circumstances of cases ending in a time-served sentence where the defendants faced higher Guidelines ranges than Mr. Mayon does in the instant matter. The following cases are illustrative:

- *United States v. Ernesto Mejia*, CR 19-719 CRB. Mr. Mejia was convicted of a $20 sale of two bindles of heroin. Immediately upon his change of plea, Judge Breyer summarily sentenced him to time served (effectively 23 days).
- *United States v. Brayan Arteaga*, CR 19-426 WHO. Mr. Arteaga was convicted of a $16 crack cocaine sale. He was on probation at the time of the offense, and faced a Guidelines range of 8–14 months with an offense level of 10 and a Criminal History Category of II. Judge Orrick sentenced him to time served (effectively one month).
- *United States v. Jose Ramos-Varela*, CR 19-713 EMC. Mr. Ramos-Varela was arrested for a $20 methamphetamine sale, and additional heroin was recovered from his person when he was arrested. He had one prior deportation that occurred subsequent to a prior felony drug conviction. His Guidelines range was 10–16 months. Judge Chen sentenced him to time served (effectively two months).

### CONCLUSION

For all the reasons set forth above, Mr. Mayon respectfully requests that the Court impose a

---

[7] His prior criminal record consists of three misdemeanor state convictions. *See* PSR ¶¶ 29–31.

sentence of time served followed by one year of supervised release, which would properly acknowledge the minor nature of his offense while also providing him access to necessary supportive services. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated: April 29, 2020

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

       /S
ANGELA CHUANG
Assistant Federal Public Defender